AMERICAN EXPORT ISBRANDTSEN
LINES, INC. and Prudential Lines,
Inc., Petitioners,

v.

FEDERAL MARITIME COMMISSION
and United States of America,
Respondents.

Nos. 416 and 417, Dockets 32357 and 32358.

United States Court of Appeals
Second Circuit.

Argued March 7, 1969.

Decided April 8, 1969.

Whitman Knapp, New York City (Barrett Knapp, Smith & Schapiro, David Simon, Sigmund A. Beck, New York City, Kurrus & Jacobi, Richard W. Kurrus, Raymond P. De Member, Washington, D. C., on the brief), for petitioners.

Kenneth H. Burns, Solicitor, Federal Maritime Commission, Washington, D. C. (James L. Pimper, Gen. Counsel, John E. Cograve, Deputy Gen. Counsel, H. B. Mutter, Asst. Solicitor, Federal Maritime Commission, Edwin M. Zimmerman, Asst. Atty. Gen., Erwin A. Seibel, George Edelstein, Attys., U. S. Dept. of Justice, on the brief), for respondents.

Before LUMBARD, Chief Judge, and SMITH and KAUFMAN, Circuit Judges.

LUMBARD, Chief Judge:

American Export Isbrandtsen Lines, Inc. and Prudential Lines, Inc. petition to review a report and order of the Federal Maritime Commission which found them guilty of unjust discrimination in violation of section 17 of the Shipping Act of 1916, 46 U.S.C. § 816, because they charged higher rates for shipments of household goods by the State Department than for similar shipments by the Defense Department during 1965 and the first six months of 1966. Jurisdiction to review the Commission's decision is con-

ferred by 28 U.S.C.A. § 2342(3). For the reasons stated below, the order of the Commission is modified to eliminate the finding of unjust discrimination during the period in question.

Both of the petitioners are engaged in the steamship business as subsidized common carriers by water in foreign commerce, and both serve the trade between North Atlantic ports of the United States and the Mediterranean. During 1965 and the first six months of 1966, the rate applicable to all household goods shipments between these points, except shipments of household goods by the military, was the rate established by the North Atlantic Mediterranean Freight Conference, a ratemaking organization to which both petitioners belonged. During this period the State Department paid this Conference rate for its shipments of household goods.

Ratemaking organizations, such as the Mediterranean Conference, are authorized by § 15 of the Shipping Act, subject to approval by the Federal Maritime Commission. Under § 18 of the Shipping Act all rates arrived at by such an organization must be set forth in a published tariff filed with the Commission, and any member of the organization which charges a rate greater or lesser than the one set forth in the tariff is subject to a penalty of $1000 per day. In order for a member of a conference or other ratemaking organization to charge any rate other than the conference rate, the conference itself must first relinquish control over the particular rate in question. This is done either by "open-rating" the particular item in the conference tariff (i. e., allowing each member to determine its own rate) or otherwise eliminating the item from the coverage of the conference tariff.

Because of the government's longstanding policy of negotiating special rates for military cargo, the Mediterranean Conference had relinquished control over shipments of household goods by the military. During the period in question the rates for these shipments were determined by negotiations between the Military Sea Transportation Service (MSTS) on behalf of the military departments and the Atlantic & Gulf American Flag Berth Operators (AGAFBO), a ratemaking organization composed of United States-flag carriers, including the petitioners, and established for the purpose of setting rates for shipments by MSTS. The AGAFBO rates, like those of the Mediterranean Conference, were filed with the FMC and published in a separate tariff.

Pursuant to an investigation entitled Northern Atlantic Mediterranean Freight Conference—Rates on Household Goods, Docket No. 66–49, the Maritime Commission found that during 1965 and the first six months of 1966, petitioners carried shipments of State Department household goods under the Conference tariff of $81.50 per ton, while transporting MSTS shipments of household goods to the same destination under substantially identical circumstances at $36.20 per ton. The Commission held that this amounted to unjust discrimination in violation of § 17 of the Shipping Act,[1] and ordered:

> That [petitioners] cease and desist from the violation of section 17 of the Shipping Act, 1916, found herein \* \* and
>
> \* \* \* that the North Atlantic Mediterranean Freight Conference relinquish control over the rates on State Department household goods \* \* \*.

1. Section 17 provides in pertinent part:

 No common carrier by water in foreign commerce shall demand, charge, or collect any rate, fare, or charge which is unjustly discriminatory between shippers or ports, or unjustly prejudicial to exporters of the United States as compared with their foreign competitors. Whenever the Federal Maritime Board finds that any such rate, fare, or charge is demanded, charged, or collected it may alter the same to the extent necessary to correct such unjust discrimination or prejudice and make an order that the carrier shall discontinue demanding, charging, or collecting any such unjustly discriminatory or prejudicial rate, fare, or charge.

The second part of the order was complied with when, on April 19, 1968 the Mediterranean Conference filed an amended tariff with the Commission which "open-rated" State Department household goods. Since then each of the petitioners has eliminated the difference in the rates charged to the State Department and the Defense Department. Petitioners thus contest only that part of the Commission's order which found them in violation of § 17.

██ We agree with the petitioners that the Commission's finding of unjust discrimination was unwarranted. The difference in the rates here, rather than resulting from the carriers' unjustly discriminating "between shippers," was the result of a choice by the United States Government, the world's largest shipper, to use different methods of dealing with the carriers depending on which of its departments was doing the shipping and which kind of arrangement seemed more satisfactory to the particular department. AGAFBO was organized at the request of the government, acting through MSTS; the lower rate on military household goods was undoubtedly to a large extent dictated by the government.[2] See Rates on United States Government Cargoes, Docket 65–13, 7 SRR 899, 905. And, because MSTS rates were negotiated on a special "package basis," the lower rate on household goods was at least to some extent offset by higher rates on other items.[3] Through another agent, the Secretary of State, the government

elected to have the State Department ship its household goods at the Conference rate rather than through MSTS at the AGAFBO rate. It would be manifestly unfair to brand as "unjustly discriminatory" the resulting difference in rates for which the government was in large part responsible.

 It is true that American Export and Prudential made no effort to change the State Department rate established by the Conference. But since these carriers were only two of the twenty members of the Conference, and since a vote of ⅔ is required to effect such a change, there is no reason to think that any effort by the petitioners would have been successful. In contrast, it is likely that the State Department could have received the benefit of the lower AGAFBO rate had it chosen to coordinate its negotiations with those of the MSTS. But as long as the conference rate was in effect, the carriers would, under § 18(b) of the Shipping Act, have been liable to a penalty of $1000 per day if they charged the State Department a rate other than that filed by the Conference with the Commission. In these circumstances the burden was on the government, not on the petitioners, to remedy the allegedly discriminatory rates, either on its own, through negotiation with the carriers, or with the aid of the Commission. Any delay in eliminating the disparity in rates is therefore attributable to the government, and there was no basis for finding the petitioners guilty of unjust discrimination.[4]

2. In fact, the system of rate reductions to the military had been investigated and approved, subject to certain modifications, prior to the period in question in a proceeding initiated by the Commission's predecessor and concluded by the Commission. Atlantic and Gulf American-Flag Berth Operators Agreement No. 8086, Docket No. 911.

3. Under the package system, all rates for MSTS shipments were negotiated at the same time, and naturally certain rates were traded off against others. There was evidence at the hearing before the Commission that MSTS, for internal rea-

sons, insisted on lower rates on military household goods in return for granting an increase for other goods in the package.

4. This is not to say that a carrier charging a conference rate can never be guilty of unjust discrimination. In the case of two shippers being treated differently by a conference tariff, it would be no defense to a charge of unjust discrimination merely to claim adherence to the tariff. Likewise, if a filed tariff covered some shippers and not others, charging lower rates to the excluded shippers might well be illegal under the Act.

The order of the Commission is modified to eliminate the finding of unjust discrimination in violation of § 17 of the Shipping Act.